# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **DPF ALTERNATIVES, LLC,** | § | |
| **DPFSOURCE LLC,** | § | |
| **DPF SOURCE HOLDINGS, LLC** | § | **Civil Action No. 3:24-cv-01953-B** |
| | § | |
| **Plaintiff/Counterclaim Defendant,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DET DIESEL EMISSION TECHNOLOGIES,** | § | |
| **LLC,** | § | |
| | § | |
| **Defendant/Counterclaim** | § | |
| **Plaintiff/Third Party Plaintiff,** | § | |
| | § | |
| **SYNERGY CATALYST, LLC,** | § | |
| **PERFORMANCE INDUSTRIES, INC., and** | § | |
| **MICHAEL VANPATTEN,** | § | |
| | § | |
| **Defendant,** | § | |
| | § | |
| **COLLATERAL RESOURCES, LLC d/b/a DPF** | § | |
| **ALTERNATIVES GREELEY, CO; DPF** | § | |
| **ALTERNATIVES GRAND** | § | |
| **JUNCTION, CO; DPF ALTERNATIVES IOWA** | § | |
| **LLC; LUSTER DUSTERS, LLC** | § | |
| **d/b/a DPF ALTERNATIVES OF SOUTHERN** | § | |
| **KENTUCKY; DPF** | § | |
| **ALTERNATIVES CENTRAL & MIDWEST** | § | |
| **OHIO; DPF ALTERNATIVES, LLC d/b/a DPF** | § | |
| **ALTERNATIVES AUBURN, WA; DPF CLEAN** | § | |
| **TECHNOLOGIES, INC.; DPF** | § | |
| **ALTERNATIVES OF SOUTHERN** | § | |
| **INDIANA LLC; and DPF ALTERNATIVES** | § | |
| **WEST HOUSTON,** | § | |
| | | |
| **Counterclaim Defendants.** | | |

## SECOND AMENDED COMPLAINT

Plaintiffs DPF Alternatives, LLC ("DPF Alternatives"), DPFSource LLC ("DPFSource"), and DPF Source Holdings, LLC ("DPF Source Holdings, collectively "Plaintiffs") by and through its undersigned counsel, brings this action against defendants DET Diesel Emission Technologies, LLC ("DET"), Synergy Catalyst, LLC ("Synergy") and Performance Industries, Inc. ("Performance Industries") (collectively "Corporate Defendants") and Michael VanPatten (collectively, with the Corporate Defendants, "Defendants") alleges, on knowledge and to its own actions and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This action by Plaintiffs seeks compensation and redress from Defendants' unlawful business practices that have harmed Plaintiffs, directly and indirectly through DPF Alternatives' nationwide network of franchisees.

2.       Beginning in 2021, Defendants heavily promoted and advertised that they had achieved patent protection on its technology and processes that it was offering to the public, and in particular, targeting DPF Alternatives and its franchisees.

3.      In 2021 and continuing until July 2024, Defendants had no issued patents, either through assignment or license, let alone any patent that covers its offered technology and processes.

4.      Relying on these demonstrably false claims of patent ownership, DPF Alternatives and its franchisees entered into agreements to sell and offer Defendants' products and services on the express understanding that Defendants would aggressively enforce their (non-existent) patent rights, inducing DPF Alternatives' franchisees to overpay for unpatented materials and services at the risk of being "locked out" by Defendants.

5.      In particular, Defendants' use of the non-existent patent rights for three years have constrained Plaintiffs' ability to produce and commercialize a competing technology through DPF Alternatives' franchisees.

2

6. This action seeks redress for Defendants' unlawful use of false marking and false advertising under the patent statute, the Lanham Act, the Sherman Act, the Texas Deceptive Trade Practices Act ("DTPA") and state tort laws.

7. Additionally, since this matter was initially filed, Defendant DET has now asserted U.S. Patent No. 12,048,920 (the "'920 Patent") against DPF Alternatives.

8. The '920 Patent, which purports to claim a novel "[s]ystem and process for replacing a core of diesel emission control device," and in particular, equipment and method for "re-coring" a diesel particulate filter, represents technology stolen from its original inventor, Don Holt.

9. Prior to the filing of the application for the '920 Patent, an agent of DET, Mr. Peter Lambe, visited Mr. Holt's workshop, where Mr. Holt exhibited and demonstrated his re-coring press.

10. Mr. Lambe took Mr. Holt's invention for Defendants' principal, Mr. Michael VanPatten and himself to claim as the inventors of Mr. Holt's press and filed for a patent application on the same invention, which issued as the '920 Patent, at Mr. VanPatten's direction.

11. Moreover, DET's claim of infringement of the '920 Patent against DPF Alternatives is factually baseless as DET fails to identify every element is present in the accused DPF Alternatives device, and in particular, claims a stand-alone commercial plastic trash can as part of DPF Alternatives' accuse device.

## PARTIES

12. Plaintiff DPF Alternatives is a limited liability company with its principal place of business located at 1745 Shea Center Drive, 4th Floor, Highlands Ranch, CO 80129.

13. Plaintiff DPFSource is a limited liability company with its principal place of business located at 8224 W Trail South Dr, Littleton, CO 80125.

14. Plaintiff DPF Source Holdings is a limited liability company with its principal place of business located at 1745 Shea Center Drive, 4th Floor, Highlands Ranch, CO 80129.

15.    Upon information and belief, Defendant DET Diesel Emission Technologies, LLC is a Texas limited liability company with its principal place of business located at 1122 West Bethel Road, #400, Coppell, TX 75019.

16.    Upon information and belief, Defendant Synergy Catalyst, LLC is a Texas limited liability company with its principal place of business located at 1122 West Bethel Road, #400, Coppell, TX 75019.

17.    Upon information and belief, Defendant Performance Industries, Inc. is an Illinois corporation with its principal place of business located at 1122 West Bethel Road, #400, Coppell, TX 75019.

18.    Upon information and belief, Defendant Michael VanPatten is a Texas resident with an address at 5600 Lighthouse Drive, Flower Mound, TX 75022.

19.    Performance Industries owns 100% of DET.

20.    Upon information and belief, Corporate Defendants operate under and use the assumed name "Recore."

21.    Corporate Defendants commonly hold themselves out as "Recore" or "Recore Centers" while those in the industry commonly referred to Defendants as "Recore," rather than the Corporate Defendants' actual corporate names.

22.    For example, Corporate Defendants operate their website, their Facebook page, and their Instagram account under the name "Recore Centers."

23.    For further example, one of the Corporate Defendants has issued "credit memos," a rebate-like payment to its franchisees for the return of certain materials, such as used cores, in the name of "Recore Centers." At least one of these "credit memos" was issued in a document with a label including "Synergy Catalyst, LLC" in the file name.

24.    Performance Industries maintains the records of these credits for "Recore Centers" as a report for a franchisee was issued by Holly Bumpass, who listed her title as "Office Manager/HR" for "Performance Industries."

25.     Synergy has twice registered the name "Recore" as an assumed name with the Texas Secretary of State. Synergy submitted both filings on October 26, 2021, with one of the filings expiring on October 26, 2022, and the other filing active with an expiration date of October 27, 2031.

26.     Corporate Defendants also commonly hold themselves out as "Diesel Emission Technologies" or "Diesel Emission Technologies LLC" despite not being the corporate or assumed named for any valid entity and thus are unincorporated entities owned and controlled by VanPatten.

27.     Corporate Defendants purportedly operate a website for "Recore" at recorecenters.com. The website lists "Diesel Emission Technologies" as the owner and contact point for the website.

28.     Peter Lambe, who, upon information and belief, works for all Defendants, uses an email address with the domain "dieselemissiontechnologies.com" and lists his company as "Diesel Emission Technologies," holds himself out on LinkedIn as the "President" of "Diesel Emission Technologies," and the "Business Development Director" of "Recore Centers."

29.     Corporate Defendants have two registered federal trademarks for the word mark RECORE and for an illustrated mark for "RECORE CENTERS DOCS & DPFS" with the current owner of both listed as "Diesel Emission Technologies LLC." The trademark applications were signed on behalf of by "Diesel Emission Technologies LLC" by "Mike VanPatten" with the listed position as "Principal."

30.     In a presentation made specifically for DPF Alternatives and its franchisees to purchase Corporate Defendants' equipment and sign up to be Corporate Defendants' franchise held at Defendants' offices in August 2021, Defendants listed the presentation as given by "Diesel Emission Technologies" and listed "Performance Industries," "Synergy Catalyst," and "Diesel Emission Technologies" as offering "Recore" and "Recore Centers" products as services.

5

31.     On at least four Equipment Financing Agreements between DPF Alternatives/Recore franchisees and Tandem Financing, executed for the purpose of purchasing equipment and/or inventory from Corporate Defendants, the supplier name for each of the Equipment Financing Agreements is listed as "Performance Industries Inc. DBA Diesel Emission Technologies." On information and belief, Corporate Defendants' use of a fictious name for Equipment Financing Agreements was to induce the lending the permit the franchisees' purchase of Corporate Defendants' equipment and evade due diligence into Defendants that would have prevented the transactions from occurring.

32.     On a "New Customer Account Data Form" provided by Corporate Defendants to DPF Alternatives' franchisees, the form provides a series of checkboxes for entities "DET," "PI," "Synergy," and "Recore Center" for the new account to be associated with an entity.

33.     Upon information and belief, both DET and Synergy are single-member LLC, with both Defendants operating under the same sole member and shareholder, Michael VanPatten.

34.     Upon information and belief, Michael VanPatten is the sole officer of Performance Industries as President, Secretary, and Director, and owns 100% of the shares of common stock, the only stock issued by Performance Industries.

35.     Upon information and belief, Corporate Defendants use the same location, resources, and staff in the operation of their businesses, most significantly their owner Michael VanPatten.

36.     On Defendants' website, recorecenters.com, eleven employees are listed with contact information. One of the employees is Peter Lambe, with "dieselemissiontechnologies.com" in his email address for his contact information. Of the ten other employees, seven have an email address ending in the domain "metalsubstrate.com." The website metalsubstrate.com has Performance Industries' "PI" logo at the heading of the home page. For the contact information on the metalsubstrate.com home page, two of the three email

addresses listed ends in the domain synergycatalyst.com. The web synergycatalyst.com has Synergy's name and logo at the heading of the home page.

37.    The websites metalsubstrate.com and synergycatalyst.com are nearly identical websites, as both websites offer "Transforming your emission needs into immediate catalyst solutions for a wide variety of applications – diesel, aerospace, gasoline, turbine, coffee roasting, wood stove, and industrial VOC's" and that "We specialize in manufacturing custom emission solutions tailored to your specific needs. Whether your final solution is to be applied to a single monolith or to a large set of substrates. These custom catalytic technologies and associated catalyst coating techniques are tailored to help you achieve your emission reduction goals." Both websites also list the same "In-house, state-of-the-art catalyst testing laboratory" and identify the same "chemists can simulate and test a wide variety of exhaust streams to evaluate, optimize or compare catalyst activity." The look and feel, page listings, and content for all three websites are effectively identical.

38.    Corporate Defendants list the same phone number for contacting all three companies, including listing the same phone number on recorecenters.com, metalsubstrate.com, and synergycatalyst.com.

39.    Upon information and belief, Corporate Defendants have comingled their business operations together, including their business assets such as their use and holding themselves out as "Recore" businesses.

40.    Corporate Defendants are alter egos of each other and have used the mixing and co-mingling of its operations to evade obligations and perpetuate fraud as described herein and to achieve a monopoly.

## JURISDICTION

41.    This court has jurisdiction over this action pursuant to 15 U.S.C. §§ 2 and 1121, 28 U.S.C. §§ 1331 and 1338(a) and (b), 35 USC § 292, and pursuant to the principles of supplemental jurisdiction under U.S.C. § 1367 for Texas state and common law claims.

42.    This court has jurisdiction over Defendants as they regularly transacted business in and with persons located in the State of Texas, including directing its business to the State of Texas and has purposely availed itself of the benefits of the State of Texas.

43.    Defendants also have contacts with the State of Texas arising from the acts forming the basis of DPF Alternative's claims.

44.    This action also arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2022.

45.    A real, immediate, and justiciable controversy exists between Plaintiffs and DET over the infringement, validity, and enforceability of the '920 Patent as DET has accused DPF Alternatives of infringing the '920 Patent by filing a counterclaim in this action against DPF Alternatives.

## VENUE

46.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), in that a substantial part of the events or omissions giving rise to the claim occurred within this District.

## BACKGROUND FACTS

47.    DPF Alternatives is a nationwide franchise that specializes in providing diesel particulate filter (DPF) services to the diesel industry.

48.    DPF Alternatives was established in June of 2016, and launched its franchising system on October 11, 2016.

49.    DPF Alternatives has established a strong presence and reputation within the industry, operating over 80 franchise locations nationwide.

50.    Broadly speaking, a DPF is a device designed to remove diesel particulate matter or soot from the exhaust gas of a diesel engine.

51.    The diesel particulate matter in the exhaust contains carbon compounds that have not burned because of local low temperatures where the diesel fuel is not fully atomized. These

local low temperatures occur at the cylinder walls of the engine and at the surface of large droplets of fuel. In turn, the fuel can turn into a carbon deposit at these low temperature areas.

52.    Modern diesel engines use a DPF as part of its exhaust system to capture carbon particles and then intermittently burn them by using fuel injected into the post-combustion injection into the exhaust stream or fuel injected into the exhaust stream before the filter. This prevents carbon buildup at the expense of wasting a small quantity of fuel.

53.    This process of active regeneration of the DPF ensures proper filtration during day-to-day operation of the engine, however, particulate matter will still build up over time that requires forced regeneration or replacement of the DPF.

54.    In particular, the DPFs installed on all diesel engines since 2007 need service by trained technicians and specialized equipment to perform forced regeneration or replacement of the DPF.

55.    DPF Alternatives is well known for its ultrasonic diesel particulate filter cleaning process and warranty services of DPFs.

56.    DPF Alternatives is the only national franchise brand to offer a trade-secret ultrasonic technology, along with two patent pending pieces of equipment, to completely recover and restore diesel emissions components in diesel engines manufactured in 2007 or later.

57.    DPF Alternatives' ultrasonic technology allows safe recovery of these components that contain precious metals such as rhodium, platinum, and palladium to their Original Equipment (OE) specifications at very minimal costs. The recovery of these components is necessary to remove soot and ash that reduces air flow rates to unacceptable levels, causing the diesel engine's computer system to greatly reduce power output or shut down the engine completely. Permanently removing or altering these components is in violation of both federal and state laws for commercial vehicles and equipment.

58.    The DPFs that DPF Alternatives services are generally cylindrically shaped with an inner cylindrical filter also referred to as the "core" of the DPF. DPF Alternatives can use its

ultrasonic process to fully recover the core. However, if the core is damaged, the unit must either be replaced or "re-cored."

59.    DPF Alternatives provides its franchisees with equipment, training, and other resources to provide DPF ALTERNATIVES services and products for servicing DPF units.

60.    DPF Alternatives also maintains a list of approved vendors that its franchisees may work with to supplement the DPF ALTERNATIVES services and products offered at each location.

**DEFENDANTS' FALSE STATEMENTS ABOUT ITS RECORE BUSINESS**

61.    On or about July 2021, multiple DPF Alternatives franchisees were contacted by Peter Lambe, a sales representative from "Recore," the trade name of Defendants.

62.    Lambe was offering the DPF Alternatives equipment and services on behalf of Recore that he claimed was patented technology.

63.    In particular, Defendants claimed that they had patented equipment and a method of "re-coring" a DPF.

64.    Defendants claimed its patent technology and equipment could remove the core of the DPF, allowing for repair or replacement of the DPF.

65.    Additionally, Defendants advertised at multiple trade shows where a number of DPF Alternatives' franchisees attended, including the Great American Trucking Show in Dallas, Texas in 2021, that its Recore products were patented.

66.    Defendants also made a presentation for its Recore products and services that explicitly stated its equipment and processes were patented.

67.    DPF Alternatives' representatives attended the presentation where Defendants offered its Recore products and services .

68.    Per DPF Alternatives' Franchise Agreement, a DPF Alternative's franchisee sought permission to engage vendor services with Recore.

69.     DPF Alternatives does not unreasonably withhold its permission to add vendors to its approved vendors list, provided that the vendor meets DPF Alternative standards for approved vendors. These standards include the requirements that the vendor must enhance the franchisee's and the brand's service capabilities and/or financial position, without causing the franchisee to violate the Franchise Agreement previously executed between Franchisor and Franchisee.

70.     DPF Alternatives accepted "Recore" as a vendor for those franchisees who elected to participate.

71.     Vendors to DPF Alternatives cannot offer products or services that compete with the DPF Alternatives' brand, nor can they interfere with the operation of the DPF Alternatives system.

72.     DPF Alternatives approved Defendants as an approved vendor for its Recore equipment and technology upon the following representations and agreements made by Defendants in advance of the approval, including:

a. The Recore equipment and process were protected by an issued U.S. Patent;

b. The Recore equipment and process could service selective catalytic reduction (SCR) units, which are also part of the exhaust system;

c. DPF Alternatives' franchisees would receive a protected territory for its use of the Recore equipment and process;

d. DPF Alternatives' franchisees would receive access to national accounts for servicing equipment for Recore;

e. DPF Alternatives' franchisees relationship with Defendants would be that of a vendor and not a franchisee;

f. DPF Alternatives' franchisees would be permitted to return the Recore equipment and terminate the relationship with Defendants if the DPF

Alternatives franchisee was not satisfied with the Recore equipment for a full refund of all amounts paid to Defendants;

g. DPF Alternatives' franchisees would have access to qualified,   professional sales assistance if the franchisee is not generating enough sales to justify the purchase.

73.     Based on these presentations and promises, DPF Alternatives approved Defendants as a vendor for the DPF Alternatives franchisees for Defendants' Recore equipment.

74.     Shortly after the approval on DPF Alternatives' vendor list, Defendants used threats of its patent exclusivity to coerce DPF Alternatives' franchisees into purchasing Defendants' Recore products and services. For example, Defendants used statements such as: "If you don't buy Recore, you won't be able to get into the re-coring of diesel aftertreatment components business any other way because it's patented." Defendants also used threats of selling its Recore technology to nearby competitors of the DPF Alternatives franchisees with territorial exclusivity, which, if true, would substantially harm the DPF Alternatives franchisees.

75.     Instead of providing the equipment as a vendor, Defendants used its false statements concerning the patented technology and equipment to induce the DPF Alternatives franchisees into signing long-term "master service agreements" and "financing agreements" before Defendants would provide the Recore equipment and technology.

76.      These agreements between Defendants and the DPF Alternatives franchisees are instead illegal franchising agreements, as defined under federal law, as the agreements (a) granted the DPF Alternatives franchisees a license to the Recore trademarks; (b) exercised complete control over the DPF Alternatives franchisees' operation of the business; and (c) required initial payments well in excess of $500.

77.     After approving the addition of Defendants' "Recore" to the DPF Alternatives vendor list, and after numerous DPF Alternatives franchisees had signed the franchising

agreement with Defendants, DPF Alternatives learned that Defendants have no issued patents, let alone any patents that cover the Recore technology or equipment.

78.    After the DPF Alternatives franchisees had signed the franchising agreement with Defendants, Defendants were unresponsive to DPF Alternatives franchisee phone calls concerning technical questions and order processing for materials and supplies.

79.    After the DPF Alternatives franchisees had signed the franchising agreement with Defendants, Defendants were unresponsive to making sales calls in the DPF Alternative franchisee's markets of operation to supply them with the national accounts.

80.    After the DPF Alternatives franchisees had signed the franchising agreement with Defendants, Defendants would publicly criticize and disparage the technology DPF Alternatives was using as a brand within the industry.

81.    Defendants also promised that Defendants would make DPF Alternatives' cleaning equipment and process the only approved process to service Defendants' Recore DPFs. Defendants did not, and have not, made DPF Alternatives' cleaning equipment and process the only approved process to service Defendants' Recore DPFs.

82.    After the DPF Alternatives franchisees had signed the franchising agreement with Defendants, Defendants further misrepresented to the franchisees that unless the franchisees purchased additional expensive cleaning equipment, Defendants would not allow them to offer or honor the Defendants' warranty on its Recore products.

83.    As a result of these actions, the DPF Alternatives franchisees involved with Defendants were unable to conduct the duties they committed to in their Franchise Agreement with DPF Alternatives. The language in the Defendants' contract they signed, along with the criticism they received from Defendants regarding DPF Alternatives, and unresponsiveness of Defendants to supply them with technical help, supplies required to use the Defendants' equipment, and failure to provide national accounts all worked to greatly reduce the DPF Alternatives franchisee's ability to generate the revenue needed to sustain their Recore business.

13

84.     Defendants' onerous terms of its franchising agreements with the DPF Alternatives franchisees, including excessive payments for the unpatented "Recore" equipment, jeopardized the solvency of many DPF Alternatives franchisees.

85.     DPF Alternatives has been directly harmed through Defendants' actions.

86.     DPF Alternatives franchisees have violated the terms of their franchising agreements with DPF Alternatives at the direction, insistence, and/or threats of Defendants.

87.     DPF Alternatives has lost franchising revenue from its DPF Alternatives franchisees due to Defendants' direct interference between DPF Alternatives and its franchisees. Certain DPF Alternatives franchisees have been unable to make its franchising payments to DPF Alternatives due to threats made by Defendants to siphon money to Defendants instead of DPF Alternatives.

88.     DPF Alternatives has been unable to transition its DPF Alternatives Franchisees to an alternative supplier of the same equipment due to the onerous franchising agreements Defendants coerced the DPF Alternatives Franchisees to enter. Another supplier of the "re-coring" equipment and technology is ready and available to supply DPF Alternatives Franchisees at prices that reflect the actual value of the equipment, rather than the value inflated by Defendants.

89.     Additionally, Defendants have made direct threats to enforce their non-existent patent rights against DPF Alternatives Franchisees should any DPF Alternatives Franchisee even attempt to seek other suppliers for the re-coring equipment and technology.

90.     Moreover, upon investigation into the purportedly "new" equipment and processes Defendants claim to have invented, the same equipment and method for removing the core of a DPF had been invented by another at least prior to 2014, who had publicly disclosed and offered it for sale at least as early as 2014.

91.      In particular, Peter Lambe visited the inventor of technology Don Holt, who showed Mr. Lambe how the technology and equipment worked.

92.      Without the inventor's permission, Defendants proceeded to commercialize the technology and equipment that Peter Lambe had viewed.

93.      Mr. Holt's invention included the same re-coring press that DET's principals Mr. Lambe and Mr. VanPatten claimed in their '920 Patent:



94.      Any purported patent rights for any employee, officer, or representative of Defendants would be barred by 35 U.S.C. § 102 for at least (1) not being the inventor of the technology; (2) being publicly disclosed and/or offered for sale more than one year prior to the filing date of any patent application.

95.     Utilizing the same basic technology from Mr. Holt, Plaintiff DPFSource manufactures, sells, and distributes its own system for replacing the core of a DPF under its brand called New Core™. The DPFSource New Core™ press is shown here:



96.     The New Core™ DPF core replacement system and equipment is a cost-effective solution for rehabilitating DPFs that cannot otherwise be serviced through DPF Alternatives' other cleaning and servicing methods.

97.     Starting in January 2025, DPFSoucre will provide its New Core™ system and services to DPF Source Holdings, for sales to DPF Alternatives franchisees that have been approved by DPF Alternatives to offer the New Core™ system and services.

98.     DPF Alternatives has a nation-wide exclusive partnership with DPFSource to offer the New Core™ system and equipment to approved DPF Alternatives franchisees at DPF Alternatives franchisees' locations.

99.     The New Core™ system and services is a direct competitor with the Defendants' Recore system and services, however, the New Core™ system is a fraction of the cost of Defendants' Recore system, provides superior return for franchisees using the New Core™

system over the Recore system, and is more dependable with higher quality cores than the Recore system.

### FIRST CLAIM FOR RELIEF
### FALSE MARKING UNDER 35 USC § 292
### (DPF Alternatives against Defendants)

100.    The allegations of the previous paragraphs are incorporated herein by reference.

101.    Under 35 U.S.C. § 292, a party is liable for false marking when it "marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public.

102.    Defendants sell and offer their "Recore" DPF re-coring equipment and technology to the public.

103.    Defendants have publicly advertised that their "Recore" DPF re-coring equipment and technology was "patented."

104.    At the time Defendants advertised that their "Recore" DPF re-coring equipment and technology was patented, Defendants knew that it had no issued or licensed patents, let alone a claim of an issued or licensed patent that would encompass its DPF re-coring equipment and technology.

105.    Defendants falsely represented it had a patent with the intent of deceiving the public, and in particular DPF Alternatives, to convince DPF Alternatives to add Defendants to its approved vendor list and permit its DPF Alternatives franchisees to enter into agreements with Defendants that have detrimentally affected DPF Alternatives' ability to compete in the marketplace.

106.    DPF Alternatives has been harmed in the marketplace through Defendants' false representations.

## SECOND CLAIM FOR RELIEF
## FALSE DESCRIPTIONS UNDER 15 USC § 1125 (LANHAM ACT § 43)
### (DPF Alternatives against Defendants)

107.    The allegations of the previous paragraphs are incorporated herein by reference.

108.    Defendants have made and continues to make false statements of fact in commercial advertisements and in commercial statements about its DPF re-coring equipment and technology.

109.    The false statements of fact made by Defendants have actually deceived or have the tendency to deceive a substantial segment of the audience for Defendants' commercial advertisements and commercial statements.

110.    Defendants' deception has been material, in that it is likely to influence the purchasing decision of members of the audience for the commercial advertisements and commercial statements.

111.    Defendants caused the commercial advertisements and commercial statements containing false statements of fact to enter interstate commerce.

112.    DPF Alternatives has been injured as a result of the false statements made by Defendants.

113.    Defendants have acted in bad faith in making its false statements of fact in commercial advertisements and commercial statements about its DPF re-coring equipment and technology.

114.    Pursuant to 35 U.S.C. § 1125(a)(1), Defendants are liable to DPF Alternatives for the false statements of fact.

115.    Pursuant to 35 U.S.C. § 1117, DPF Alternatives is entitled to an award of Defendants' profits, damages sustained by DPF Alternatives, and the costs of this action.


## THIRD CLAIM FOR RELIEF
## MONOPOLIZATION OF TRADE UNDER 15 USC § 2 (SHERMAN ACT § 2)
### (All Plaintiffs against Defendants)

116.    The allegations of the previous paragraphs are incorporated herein by reference.

117.    Defendants have excluded competitors from the DPF service market by falsely asserting that the DPF re-coring equipment and technology it manufactures and sells are covered are patented technology.

118.    Defendants' false advertisements and statements about its patent rights have induced DPF servicers and servicer suppliers, and in particular DPF Alternatives and DPF Alternatives' franchisees that Defendants' DPF re-coring equipment and technology was a protected by issued U.S. Patents and that it was the only supplier of the DPF re-coring equipment and technology.

119.    Defendants have possessed monopoly power in the distinct submarket for DPF re-coring equipment, or there has been a dangerous probability of Defendants achieving monopoly power in the distinct submarket for DPF re-coring equipment and other economically relevant markets.

120.    Defendants have acted with specific intent to monopolize the distinct submarket for DPF re-coring equipment and other economically relevant markets.

121.    Defendants have engaged in predatory or anticompetitive conduct in the distinct submarket for DPF re-coring equipment and other economically relevant markets.

122.    DPF Alternatives has suffered antitrust damages as a result of Defendants' monopolistic actions.

123.    Pursuant to 15 U.S.C. § 2, Defendants are liable to DPF Alternatives for Defendants' monopolization or attempted monopolization of the distinct submarket for DPF re-coring equipment and other economically relevant markets.

124.    Pursuant to 15 U.S.C. § 15, DPF Alternatives is entitled to an award of threefold the damages it sustained, and the cost of suit, including a reasonable attorney's fees for Defendants' monopolization or attempted monopolization of the distinct submarket for DPF re-coring equipment and other economically relevant markets.

## FOURTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH CONTRACT
### (DPF Alternatives against Defendants)

125.    The allegations of the previous paragraphs are incorporated herein by reference.

126.    At all relevant times, DPF Alternatives had, has, and continues to have valid contracts with its franchisees in the income derived from the franchising fees and the revenues generated by its franchisees under the terms of its franchising agreements.

127.    As part of the negotiation to become an approved vendor for DPF Alternatives, Defendants had knowledge of these franchising agreements between DPF Alternatives and its franchisees.

128.    Defendants intentionally and improperly interfered with these contracts by inducing and/or coercing DPF Alternatives' franchisees to fail to perform terms of their franchising agreements with DPF Alternatives and failing to maintain the high-quality service required to be a DPF Alternatives franchisee as a direct result of Defendants' interference with the franchisees.

129.    DPF Alternatives has suffered and will continue to suffer damages as a result of Defendants' interference with DPF Alternative's contracts with its franchisees.

130.    Defendants' wrongful conduct was willful, deliberate, malicious, and intended to injure DPF Alternatives. Accordingly, DPF Alternatives is also entitled to punitive damages in amounts yet to be determined.

## FIFTH CLAIM FOR RELIEF
## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT (DTPA) UNDER
## TEX. BUS. & COM. CODE § 17.46(b)
### (DPF Alternatives against Defendants)

131.    The allegations of the previous paragraphs are incorporated herein by reference.

132.    Defendants offered their re-coring products and services to DPF Alternatives, including at a meeting set up by Defendants for DPF Alternatives and its franchisees to purchase the Defendants' re-coring products and services at Defendants' offices in Coppell, Texas.

133.    The sale of Defendants' re-coring products and services to DPF Alternatives' franchisees was intertwined with, and for the intended benefit of, DPF Alternatives, as the sales of these products and services to the DPF Alternatives franchisees directly benefited from these sales through the increased product and service offerings of the DPF Alternatives franchisees.

134.    DPF Alternatives' franchisees' purchase of Defendants' re-coring products and services would not have occurred without the express approval and consent of DPF Alternatives.

135.    Defendants have caused confusion and misunderstanding as the source, sponsorship, approval, and certification of their DPF re-coring products and services.

136.    Defendants have caused confusion and misunderstanding as to the affiliation, connection, and association with their DPF re-coring products and services.

137.    Defendants have represented that their DPF re-coring products and services have sponsorship, approval, characteristics, uses, and benefits, which they do not have.

138.    Defendants have represented that their DPF re-coring products and services are of a particular standard, quality, and grade, when they are of another.

139.    Defendants have advertised their DPF re-coring products and services with intent not to sell them as advertised.

140.    Defendants represented that their franchising agreements conferred and involved rights, remedies, and obligations which they did not have and which are prohibited by law.

141.    Defendants represented that their warranty involved rights and remedies which it does not have.

142.    Defendants failed to disclose information concerning their DPF re-coring products and services which was known at the time of the transactions and which was intended

to induce DPF Alternatives and their franchises into transactions which they would not have entered into had the information been disclosed.

143.    Pursuant to Tex. Bus. & Com. Code § 17.46(b) Defendants are liable to DPF Alternatives for their  false, misleading, and deceptive business actions upon which DPF Alternatives relied on to its detriment.

144.    DPF Alternatives has sustained significant economic damage as a result of Defendants' false, misleading, and deceptive business actions for which it is entitled to reimbursement for Pursuant to Tex. Bus. & Com. Code § 17.46(b).

<u>SIXTH CLAIM FOR RELIEF</u>
<u>DECLARATORY JUDGMENT OF NON-INFRINGEMENT OF THE '920 PATENT</u>
<u>(All Plaintiffs against Defendants)</u>

145.    The allegations of the previous paragraphs are incorporated herein by reference.

146.    Figure 6Q of the '920 Patent illustrates curtained claimed elements of the '920 Patent, including the working platform **116**, the push plate **180**, the pushout donut **182**, and the collection container **622**.



147.    The only independent claim of the '920 Patent, claim 1, recites *inter alia* that the "push plate [is] positioned upon the working platform."

148.    Claim 1 further recites "a collection container connected between the push plate and the pushout donut."

149.    In other words, the "collection container" must be connected with the push plate **180** and, in turn, connected with the working platform **116.**

150.    DET's claim of infringement specifically only identifies a stand-alone plastic commercial trash can as the "collection container."



151.    DPF Alternatives does not sell plastic commercial trash cans and therefore does not sell an infringing device.

152.    Moreover, the identified commercial trash can in DET's infringement claim is not connected in any manner to push plate, let alone "between the push plate and the pushout donut," as shown in this photograph of the accused device with a commercial trash can:



153.    Without a "collection container," DPF Alternatives cannot infringe the '920 Patent.

154.    An immediate, real, and justiciable controversy exists between DPF Alternatives and DET regarding the infringement of the '920 Patent.

155.    Plaintiffs seek a judgment declaring that they do not infringe any claim of the '920 Patent.

**SEVENTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT OF INVALIDITY OF THE '920 PATENT**
**(All Plaintiffs against Defendants)**

156.    The allegations of the previous paragraphs are incorporated herein by reference.

157.    The claims of the '920 Patent are invalid under Title 35 of the United States Code, including but not limited to 35 U.S.C. § 102 for being sold, offered for sale, and publicly disclosed more than one year prior to the earliest filing date of the '920 Patent.

158.      The '920 Patent is also invalid for failing to include improper inventorship on the '920 Patent, namely that Mr. Lambe and Mr. VanPatten are improperly named inventors while Mr. Holt is omitted from the '920 Patent.

159.      An immediate, real, and justiciable controversy exists between Plaintiff and Defendants regarding the validity of the '920 Patent.

160.      Plaintiffs seek a judgment declaring that the claims of the '920 Patent are invalid.

## EIGHTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT OF UNENFORCEABILITY FOR INEQUITABLE CONDUCT OF THE '920 PATENT
### (All Plaintiffs against Defendants)

161.      Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

162.      On July 12, 2022, DET's principals caused to be filed Application No. 17/812,052 (the "'052 Application"), which eventually issued as the '920 Patent.

163.      DET's filing of the '052 Application triggered the legal duty of candor to the Patent Office, including disclosure of information material to patentability, which requires: "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned." 37 C.F.R. § 1.56(a); Manual of Patent Examining Procedure § 2001. Applicants before the patent office had a duty to disclose "all information known to that individual to be material to patentability" promptly, generally before the first office action by the Patent and Trademark Office. 37 C.F.R. § 1.56(a).

164.        DET's use of Mr. Holt's invention were material to the patentability of at least one pending claim in the '052 Application.

165.        Despite this duty, neither DET nor any other individual associated with the filing and prosecution of the '052 Application disclosed any information regarding Mr. Holt's invention, which was the subject matter of the '052 Application.

166.        An immediate, real, and justiciable controversy exists between Plaintiff and Defendants regarding the enforcement of the '920 Patent.

167.        Plaintiffs seek a judgment declaring that the claims of the '920 Patent are unenforceable under the doctrine of inequitable conduct.

## NINTH CLAIM FOR RELIEF
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
### (DPFSource & DPF Source Holdings against Defendants)

168.        Plaintiffs reallege the preceding paragraphs as if fully set forth herein.

169.        Defendants have no basis in fact to assert that the DPFSource New Core™ press infringes the "collection container" limitation of '920 Patent as Defendants have accused a plastic trash can that Plaintiffs do not sell as infringing this limitation.

170.        Defendants' allegations that any Plaintiff infringe any claim of the '920 Patent are objectively baseless.

171.        Since at least November 15, 2024, Defendants have had specific knowledge that Defendants' patent infringement allegations lack any basis in fact or law at Defendants received a letter from Plaintiffs identifying the missing "collection container."

172.        Despite having specific knowledge that the DPFSource New Core™ press does not have a "collection container," and that Defendants' patent was fraudulently obtained, Defendants continue to make accusations that the DPFSource New Core™ press infringes the '920 Patent.

173.     In particular, Defendants have accused Plaintiffs' potential and current customers of infringing upon its fraudulently obtained patent,  despite knowing the DPFSource New Core™ press does not infringe the '920 Patent and making knowingly false statements or material omissions in its applications to the Patent Office for the '920 Patent and the '052 Application, as set forth herein.

174.     Defendants made its knowingly false allegations of patent infringement to Plaintiff's potential and current customers knowing that the consequence would be that Plaintiff's potential and current customers would not do business with Plaintiff.

175.     In particular, VanPatten, as the officer of the Corporate Defendants, has repeatedly threatened DPF Alternatives' franchisees and potential DPFSource customers that if they purchase the DPFSource New Core™ press, that he would sue them for patent infringement.

176.     Defendants made these statements with the intent to prevent Plaintiffs from selling their New Core™ press and divert Plaintiffs' potential sales to Defendants.

177.     Plaintiffs have a valid contract and/or a business expectancy with its customers and potential customers, through which it expected to transact business to make and sell its DPF presses as described herein.

178.     Defendants knew of Plaintiffs' relationship with or business expectancy relating to its customers, as Defendants have actual knowledge of Plaintiffs' current customers, and have made false allegations concerning patent infringement against Plaintiff to these parties.

179.     By means of Defendants' fraudulent and false statements set forth herein, Defendants intentionally interfered with Plaintiff's contract and/or business expectancy, inducing or causing customers to breach its contract and/or terminate its relationship or business expectancy with Plaintiff.

180.    As a direct and proximate cause of Defendants' conduct as set forth herein, Plaintiffs have been damaged in an amount to be proven at trial due to lost sales of the NewCore™ press.

181.    Defendants' conduct as set forth herein was fraudulent, intentional, and malicious, and/or done so as motivated by spite, where Defendants used improper means to seek revenge against Plaintiff's legitimate competition and seek to maintain its unlawfully procured monopoly.

## JURY DEMAND

Plaintiff seeks a trial by jury on all matters triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays judgement against Defendants, jointly and severally, as follows:

A.    That Defendants are held to have falsely marked upon, or falsely affixed to, unpatented articles and processes sold and offered by Defendants the word "patent" or other words importing that the articles or processes are patented, for the purpose of deceiving the public;

B.    That Defendants are held to have falsely used in advertising, in connection with unpatented articles and processes sold and offered by Defendants, the word "patent" or other words that the articles or processes are patented, for the purpose of deceiving the public;

C.    That Defendants are held to have possessed unlawful monopoly power in the distinct submarket for DPF re-coring equipment and other economically relevant markets, or that there has been a dangerous probability Defendants achieving unlawful monopoly power in the distinct submarket for DPF re-coring equipment and other economically relevant markets;

D.    Award Plaintiffs their damages sustained from Defendants' unlawful patent marking, false advertising, and unlawful monopoly power in amount determined at trial;

E.    Award Plaintiffs treble damages they sustained, and the cost of suit, including reasonable attorneys' fees;

F.    Award Plaintiffs punitive damages as provided under Texas law;

G.    Entry of an injunction enjoining Defendants, its officers, directors, employees, agents, licensees, subsidiaries and affiliated companies, successors and assigns, and any and all persons in active concert or participation with any of them, from:

    a.    Engaging in any conduct suggesting or tending to suggest that any product or service promoted, advertised, performed, or offered for sale by Defendants is protected by a valid and subsisting patent; and

    b.    Conveying the impression to the public through communications, displays, advertising, packaging or otherwise that any product or service offered by Defendants is protected by a valid and subsisting patent;

H.    Declaring that Plaintiffs do not infringe a valid claim of the '920 Patent;

I.    Declaring that the '920 Patent is invalid;

J.    Declaring that the '920 Patent is unenforceable;

K.    Award DPF Alternatives three times its economic damages for knowing and intentional violations of the DTPA;

L.    Award any other legal or equitable remedies to which DPF Alternatives may be entitled, including all remedies provided for in 15 U.S.C. § 1117(a) and Texas state law, and under any other Texas state statutory or common law;

M.    Award DPF Alternatives interest and post-judgment interest; and

N.    Award such other and further relief as this Court deems just and proper.


Respectfully submitted this 9th day of January, 2025

_/s/ Michael B. Marion_
Michael B. Marion (admitted _pro hac vice_)
**BYCER & MARION**
7220 N. 16th Street, Suite H
Phoenix, Arizona 85020
Telephone: (602) 944-2277
michael@bycermarion.com

Erik Osterrieder (Texas Bar No.: 24013276)
KEARNEY, MCWILLIAMS & DAVIS
55 Waugh Drive, Suite 150
Houston, Texas 77007
Tel: (713) 936-9620
eosterrieder@kmd.law

_Attorneys for Plaintiffs DPF Alternatives, LLC,
DPFSource LLC, and DPF Source Holdings,
LLC_