UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DPF ALTERNATIVES, LLC, DPF SOURCE LLC, and DPF SOURCE HOLDINGS, LLC, | § § § § § | |
| Plaintiffs/Counter-Defendants, | | |
| v. | § § § § § | CIVIL ACTION No. 3:24-cv-1953-B |
| DET DIESEL EMISSION TECHNOLOGIES, LLC, | § § § § § | |
| Defendant/Counter-Plaintiff/ Third-Party Plaintiff, | § § | |
| SYNERGY CATALYST, LLC, PERFORMANCE INDUSTRIES, INC., and MICHAEL VANPATTEN, | § § § § § | |
| Defendants, | § § | |
| COLLATERAL RESOURCES, LLC, d/b/a DPF ALTERNATIVES GREELEY, CO, DPF ALTERNATIVES GRAND JUNCTION, CO, DPF ALTERNATIVES IOWA LLC, LUSTER DUSTERS, LLC d/b/a DPF ALTERNATIVES OF SOUTHERN KENTUCKY, DPF ALTERNATIVES CENTRAL & MIDWEST OHIO, DPF ALTERNATIVES, LLC d/b/a DPF ALTERNATIVES AUBURN, WA, DPF CLEAN TECHNOLOGIES, INC., DPF ALTERNATIVES OF SOUTHERN INDIANA LLC, and DPF ALTERNATIVES WEST HOUSTON, | § § § § § § § § § § § § § § § | |
| Counter-Defendants. | § | |

-1-

## MEMORANDUM OPINION AND ORDER

Before the Court are the parties' Claim Construction Briefs (Docs. 155, 158, 162). The Court held a claim construction hearing on October 17, 2025. Having heard the parties' arguments, the Court adopts the following constructions of the disputed claim terms.

## I.

## BACKGROUND

Plaintiffs in this and several related cases[1] are DPF Alternatives, LLC and its franchisees (collectively, "DPF"). DPF services diesel particulate filters in diesel engines, which are filters that remove environmentally hazardous contaminants from the exhaust produced by burning diesel fuel. *See* Doc. 122, Second Am. Compl. ¶¶ 47–60. One service offered by DPF is removal and replacement of the cylindrically shaped filter—the "core." *See id.* ¶ 58.

Initiating this and the several related lawsuits, DPF alleged that DET Diesel Emission Technologies, LLC and its affiliates (collectively, "DET") falsely claimed ownership of a patented system for removing and replacing a core, which DET called "Recore." *See id.* ¶¶ 61–66. Based on the purportedly false claims, DPF agreed to purchase DET's Recore equipment. *See id.* ¶¶ 72–76. Later, once DPF supposedly realized that DET's patent claims were false, DPF came up with its own system for performing the same task, which DPF calls "New Core." *See id.* ¶¶ 95–99.

In this lawsuit (but not in the related lawsuits), DET asserted patent infringement counterclaims against DPF. *See* Doc. 128, Countercls. ¶¶ 38–75. DET claims that its Recore system is registered under U.S. Patent No. 12,048,920, *see id.* ¶¶ 25–26, and that DPF's New Core system

---

[1] The related cases are 3:24-cv-1371, 3:24-cv-2018, 3:24-cv-2133, and 3:24-cv-2977.

infringes the '920 Patent, *see id.* ¶¶ 35, 37–75. DET and DPF dispute eight claim terms in the '920 Patent. The Court addresses the disputed claim terms below.

## II.

## LEGAL STANDARD

"Claim construction is a question of law." *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 977 (Fed. Cir. 2014) (citation omitted). When an inventor files a patent application with the Patent and Trademark Office ("PTO"), the patent application includes various "claims" that define the legal scope of the patent. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) ("[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." (citation omitted)). The general rule of claim construction is that claim terms must be given their plain and ordinary meaning. *Id.* The plain and ordinary meaning of a claim term is the "meaning that the term would have to a person of ordinary skill in the art." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1377 (Fed. Cir. 2021) (citation omitted).

The construction of the claim terms must be "consistent with the specification, which is the single best guide to the meaning of the disputed term." *Seabed Geosols. (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) (citation modified). The specification must sufficiently describe the invention to allow "any person skilled in the art to which it pertains . . . to make and use the [invention]." 35 U.S.C. § 112(a). The specification often includes examples of the invention and the patentee's preferred embodiments. However, the scope of the patent is not usually limited by preferred embodiments listed in the specification. *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) ("Although the specification may aid the court in interpreting the

meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.") (citations omitted).

When determining the meaning of disputed claim terms, courts also consider the patent's prosecution history, *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004), which is a "complete record of the proceedings before the PTO," and provides "evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citations omitted).

Courts can consider extrinsic evidence if the intrinsic evidence is ambiguous in defining the scope of the invention. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). Extrinsic evidence includes "evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (citations omitted).

A claim term is not given its plain and ordinary meaning "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during [the] prosecution [history]." *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citation omitted). A patentee acts as its own lexicographer only if it "'clearly set[s] forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (quoting CCS *Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). And a patentee disavows the full scope of a claim term only if "the specification [or prosecution history] makes clear that the invention does not include a particular feature . . . even though the language of the claims . . . might be considered broad enough to encompass the feature in question." *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001).

## III.

## DISPUTED TERMS

DET and DPF dispute six claim terms contained within Claim 1, one claim term within Claim 2, and one claim term within Claim 4 of the '920 patent. Each disputed claim term is discussed in turn below. Footnoted claim terms are not disputed by the parties, and their definitions—if defined apart from their plain and ordinary meanings—are provided for context.

A. *Claim 1*

1. <u>Working Platform</u>

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
|---|---|---|---|
| A system for removing an existing core[2] from a DECD housing[3] comprising: a core press station[4] having a piston and a **working platform**; | a structure that provides support for a DECD housing during removal of a core | a structure that provides support to set a DECD housing and to set a push plate | a structure that provides support for a DECD housing during removal of a core |

DET and DPF agree that the working platform provides support, but they spar over (1) what exactly it supports, (2) inclusion of the language "to set," and (3) whether there should be any temporal limitation to when the support is provided.

First, DET argues that the working platform supports only the DECD housing, while DPF argues that it also supports the push plate. DPF bases its argument on language used later in Claim

---

[2] An "existing core" is "a previously used/installed diesel particulate filter positioned within a DECD housing." Doc. 160, Joint Cl. Constr. Chart, 4.
[3] A "DECD housing" is "a structure configured to receive a core." Doc. 160, Joint Cl. Constr. Chart, 4. "DECD" stands for "diesel emission control device." '920 Patent, Abstract.
[4] A "core press station" is an "apparatus that is configured to press a core out of a DECD housing." Doc. 160, Joint Cl. Constr. Chart, 4.

1 describing a "push plate positioned upon the working platform" and on Figure 6Q, which depicts the push plate and the DECD housing atop the working platform. *See* Doc. 158, DPF's Br., 12–13. At the hearing, DET argued that Figure 6Q is merely one embodiment, which should not be read as a limitation into the claim. *See Comark*, 156 F.3d 1182 at 1187. DET also points to Figure 2A, which depicts the working platform without the push plate. *See* Doc. 162, DET's Reply, 1–2. Based on this embodiment, DET argues that the working platform is independent from the push plate. *See id.* at 2. Because the claim construction cannot contradict the specifications, *see Seabed Geosols.*, 8 F.4th at 1287, DET is correct that the construction of the term "working plate" does not necessarily include support for the push plate. In addition, DPF's reference to the language appearing later in Claim 1 regarding the push plate's interaction with the working platform (that the former is "positioned upon" the latter) is best addressed by construing that subsequent claim term rather than by using it to limit what "working platform" means.

Second, DPF proposes that the working platform provides support "to set" a DECD housing. *See* Doc. 158, DPF's Br., 13. DET responded in briefing and at the hearing that those words are nowhere in the claim or the specifications. *See* Doc. 162, DET's Reply, 1. At the hearing, the Court asked DPF where it came up with the "to set" language, and counsel for DPF represented that "to set" was a description of what is occurring in Figure 6Q. The words "to set" are therefore DPF's own creation based on interpretation of Figure 6Q, which is merely one embodiment. The Court thus declines to include the words "to set" in the construction of "working platform."

Third, DET proposes that the working platform provides support "during removal of a core," which DPF asserts is an improper importation of temporal and functional limitations. *See* Doc. 158, DPF's Br., 13. DET argues that Claim 1's preamble supports its proposed limitations because the

preamble identifies the claim as "[a] system *for removing an existing core*." *See* Doc. 162, DET's Reply, 2 (quoting '920 Patent at 12:22). Thus, DET argues it is not importing any limitation that does not already exist within the claim's language. *See id.* DET's construction is correct because the claim construction should adequately describe what the "working" refers to in "working platform." The "work" described in Claim 1 is "removal of a core," and the working platform doesn't provide support to the DECD housing except when the "work" is being done—*i.e.*, during core removal.[5]

For these reasons, the Court adopt DET's construction of "working platform."

### 2. Decore Shaft

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
| --- | --- | --- | --- |
| a control station for controlling movement [of] the piston; a **decore shaft** connected to the piston; | a shaft configured to connect to a piston | an apparatus having a rod with an end orthogonally coupled to a circular disk for removing a core | a shaft designed to remove cores from a DECD housing |

Generally, the decore shaft is the part of the Recore system that pushes down on the DECD to push out the existing core. Determining the construction of this term can be boiled down to the following three issues: (1) whether "decore shaft" in Claim 1 can be limited by components of the same term in Claim 2, (2) whether "shaft" should be delimited to "rod," and (3) whether the decore shaft's function—"removing a core"—should be included in its construction.

First, both DET's and DPF's proposed constructions of "decore shaft" in Claim 1 improperly import limitations from Claim 2. Under the doctrine of claim differentiation, "each claim in a

---

[5] The '920 Patent specifications and the parties' briefing describe both the removal *and* replacement functions of the Recore system, but the claim language itself only refers to removal. Counsel for both DPF and DET agreed at the claim construction hearing that the proper way to understand the '920 Patent is therefore as only a core-removal system, despite the real-life dual function of the Recore system.

patent is presumptively different in scope," especially where additional limitations are found in a dependent claim. *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002) (citation omitted). "Decore shaft" appears in Claim 1 and then appears again in Claim 2 with additional limitations. Claim 2 depends on the system in Claim 1 and further breaks down the components of the decore shaft. Thus, the additional limitations from Claim 2 cannot be included as part of the construction of Claim 1 because of the doctrine of claim differentiation.

DET appropriately criticizes DPF's proposed construction for including reference to the "circular disk," by which DPF means the decore engagement plate referenced in Claim 2. *See* Doc. 162, DET's Reply, 3. How exactly the parts of the decore shaft are connected to each other—*i.e.*, whether "orthogonally" or not—is likewise part of Claim 2, not Claim 1. Despite its valid criticism of DPF's construction, DET also violates the doctrine of claim differentiation by proposing a construction that the shaft is "configured to connect to a piston," which is a limitation contained in Claim 2 as well. In Claim 1, the decore shaft is connected to the piston, but the claim language does not say that the decore shaft is "configured" for that connection.

Second, the parties disagree over whether "shaft" should just be "shaft" or should be construed as a "rod." DPF points to the embodiment in Figure 3A to argue that the shaft is depicted as a rod. *See* Doc. 158, DPF's Br., 14. DET correctly argues in response that the specification does not limit "shaft" to just a rod and that the plain meaning of "shaft" is broader than "rod." *See* Doc. 162, DET's Reply, 3. DPF argues that "shaft" cannot be used to define "decore shaft" because claims must be definite in meaning, and DET's proposed construction would include any kind of shaft on the planet. *See* Doc. 158, DPF's Br., 15. DPF is correct that the claim term must be construed in a definite manner, but the specialized part of the claim term is the "decore" part, not the "shaft" part.

"Decore" answers the question "what kind of shaft," so inclusion of a limitation with respect to "decore" delimits the term to only certain kinds of shafts.

Finally, the parties differ in terms of including the function of the decore shaft in the claim construction. DET's proposed construction does not include any reference to removal of the core, and DPF's proposed construction includes "removing a core" but improperly attributes that function to the "circular disk," which is not part of Claim 1. On this question, the specification states that the decore shaft "is designed to remove cores from the DECD housings." '920 Patent at 6:25. This description is not specific to any one embodiment, and it gives "decore shaft" a definite meaning based on what it means to "decore."

The Court therefore construes "decore shaft" in Claim 1 as "a shaft designed to remove cores from a DECD housing."

### 3. Push Plate

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
| --- | --- | --- | --- |
| a **push plate** positioned upon the working platform, the push plate having a first internal aperture configured to pass the existing core therethrough; | a plate configured to allow a core to pass therethrough | a disk configured to allow an existing core to pass therethrough | a plate configured to allow an existing core to pass therethrough |

Generally, the push plate is the structure on which the DECD sits as its core is removed. DPF and DET dispute only whether the push plate must be a "disk."[6] Both sides point to the

---

[6] Another apparent difference between the proposed constructions is over whether the push plate allows an "existing core" or any "core" to pass through, but counsel for DET—which did not originally include the word "existing" in its proposed construction—represented at the hearing that DET would take no issue with specifying that an "existing core" is what passes through the push plate.

embodiments in Figures 3B and 6Q, which depict the push plate (180) as a square/rectangle with a circular hole:



FIG. 3B                FIG. 6Q

In the same way that DPF argued against including the word "shaft" in the construction of "decore shaft," DPF argues that using the word "plate" to describe "push plate" is not definite. *See* Doc. 158, DPF's Br., 16. Once again, however, the full term is delimited in scope by the remainder of its construction, so there is nothing inherently wrong with using "plate" in the construction.

DPF nevertheless argues that the word "disk"—which it defines without citation to any dictionary as "a thin, flat structure"—aligns with the visual and descriptive content of the '920 Patent. *See id.* DET responds, citing Webster's II New College Dictionary (2001), that the commonly understood meaning of "disk" is "a thin, flat, circular plate" and that the two embodiments clearly depict a non-circular push plate. *See* Doc. 162, DET's Reply, 4. The Court agrees with DET that the embodiments contradict DPF's proposed construction and that the claim term should be construed according to its plain language as a "plate," delimited by its configuration—allowing an existing core to pass through—that is agreed upon by the parties.

The Court therefore construes "push plate" as "a plate configured to allow an existing core to pass therethrough."

### 4. Push Plate *Positioned Upon* the Working Platform

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
|---|---|---|---|
| a **push plate *positioned upon* the working platform**, the push plate having a first internal aperture configured to pass the existing core therethrough; | No construction necessary; plain and ordinary meaning applies in conjunction with the proposed constructions for push plate and working platform | a disk configured to allow an existing core to pass therethrough and is secured in place onto the working platform | Plain and ordinary meaning applies in conjunction with constructions of "push plate" and "working platform" |

For this claim term, the disagreement is over whether "positioned upon" should have its ordinary meaning or should acquire a specialized meaning proposed by DPF: "secured in place onto." In support of its proposed construction, DPF argues that because the push plate is an integral component to a mechanical system demanding stability, the push plate must be secured into place. *See* Doc. 158, DPF's Br., 17. Courts construe claim terms like "mounted" based on context. *Compare Feliz v. Am. Honda Motor Co.*, 562 F.3d 1167, 1177–79 (Fed. Cir. 2009) (construing "mounted" to mean "securely affixed or fastened to" because, due to "the law of gravity," the components would fall out and not function if not secured), *with Traxxas, L.P. v. Hobbico, Inc.*, No. 2:16-CV-00768-JRG-RSP, 2017 WL 4347709, at *13–14 (E.D. Tex. Sept. 29, 2017) (giving "mounted" plain and ordinary meaning where used to describe positionality among different components and not contradicted by intrinsic evidence).

Here, while the specification states that "some embodiments" involve inspection to ensure the push plate is "secured and bolted in place," '920 Patent at 7:64–8:3, the "secured in place" language does not appear in the claim itself, and those embodiments do not limit the scope of the

patent. DPF references other specification language describing how the collection container is "secured" between the pushout donut and the push plate so as to create a "tight seal," *see* Doc. 158, DPF's Br., 17, but this language does not describe the push plate's position with respect to the working platform. DPF also presents the prosecution history behind the arrangement among the push plate, collection container, and pushout donut, *see id.* at 18, but again those references do not say anything about the push plate's relation to the working platform. Instead, DPF argued at the hearing that the claim was allowed based on "securement" of the system together, rather than a system of "free-floating" components. But the prosecution history does not speak to any "securement" between the push plate and the working platform specifically, nor does it reveal any functional reason that the push plate could not be freely lifted from the working platform between core removals.

The Court therefore construes the claim term based on its plain and ordinary meaning in conjunction with other defined terms.

### 5. Pushout Donut

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
|---|---|---|---|
| a **pushout donut** demountably connected to the push plate, the pushout donut having a second internal aperture configured to pass the existing core therethrough; and | a structure configured to receive an end of a DECD housing | an apparatus with a central hole configured to allow an existing core to pass through said central hole | an apparatus with a central hole configured to allow an existing core to pass through said central hole |

Generally, the pushout donut is the component of the Recore system on which the DECD housing sits, and the pushout donut has a hole through which the old core is pushed down into a

collection container. DPF and DET disagree over whether "pushout donut" should be construed in terms of its relation to the DECD housing or to the core that passes through it. DET argues that the pushout donut should be defined as "configured to receive an end of DECD housing," while DPF argues that the pushout donut is "configured" for the purpose of allowing a core to pass through. DET supports its argument by citing specifications that describe the pushout donut as being sized to complement the outside diameter of a core. *See* Doc. 155, DET's Br., 15 (citing '920 Patent at 8:17–20). But DET appears to miss that the specification describes complementarity with the core size, not the DECD housing. The claim's language describes the pushout donut as configured to allow an existing core to pass through, so DPF's construction is correct in this regard.

DPF is also correct in its assertion that DET's proposed construction ignores the intrinsic meaning of "donut" as having a hole. DPF points to embodiments showing the pushout donut as a circular piece with a central hole—which is how one might commonly picture a "donut." *See* Doc. 158, DPF's Br., 19. At the hearing, counsel for DET agreed that a "donut," by its plain and ordinary meaning, must have a central hole. The Court therefore adopts DPF's construction of "pushout donut."

6. Collection Container

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
|---|---|---|---|
| a **collection container** connected between the push plate and the pushout donut, the collection container configured to receive the existing core, whereby movement of the piston is configured to push the existing core out of the DECD housing. | No construction necessary; plain and ordinary meaning applies | a bag | Plain and ordinary meaning applies |

Here, DPF and DET argue over whether the "collection container" must be a "bag." Disavowal of the broad scope of the claim term through narrower specifications must be "clear." *SciMed Life Sys.*, 242 F.3d at 1341. Every specification describing the collection container identifies some kind of "bag," but each description uses a qualifier (*e.g.*, "such as" or "in certain embodiments") so as not to disavow that "collection container" as a claim term is broader than just a bag. *See* '920 Patent at 6:38–41, 8:9–12, 9:6–8. Because of the consistent use of qualifiers, DET has not clearly disavowed the broader meaning of collection container.

At the hearing, DPF argued that because the invention would not work if the push plate, collection container, and pushout donut are not tightly sealed together, the collection container must be some kind of "flexible receptacle," as opposed to a rigid container. But DPF has not explained how tight sealing and rigidity are mutually exclusive. Moreover, as DET argued at the hearing, the main function of the collection container, which is to contain the environmentally hazardous old core, might be better served by a rigid container. The Court therefore agrees with

DET that "collection container" should have its plain and ordinary meaning, encompassing both rigid and flexible types of containers.

  B.  *Claim 2*

    1.  <u>Decore Engagement Plate</u>

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
|---|---|---|---|
| The system of claim 1, wherein the decore shaft comprises: a decore shaft portion having a first female aperture configured to connect to the piston; and a **decore engagement plate** disposed opposite the first female aperture. | a plate configured to contact a core for removal from a DECD housing | a portion of the decore shaft that is a circular disk | a portion of the decore shaft that is configured to contact a core for removal from a DECD housing |

Generally, the decore engagement plate (154) is the bottom portion of the decore shaft, which is the part of the Recore system that the Court construed above in Part III.A.2 of this Opinion:



FIG. 3A

The parties disagree over (1) whether the claim construction should specify that the decore engagement plate is part of the decore shaft, (2) whether the claim construction should refer to the component's function (*i.e.*, contacting a core for removal), and (3) whether the plate must be a "circular disk."

First, DPF argues that the claim construction should include that the decore engagement plate is "a portion of the decore shaft," and DET argues that the two are separate components. Claim 2's language describes the "decore shaft" from Claim 1 as "comprising" both a "decore shaft portion" (152 above) and a "decore engagement plate." This use of "decore shaft portion" as part of the "decore shaft" is somewhat confusing, but it is nevertheless clear that these are separate terms based on the claim language and based on Figure 3A, which depicts the entire structure (150) as the "decore shaft" but just the top part (152) as the "decore shaft portion." Thus, DPF is correct that the decore engagement plate is "a portion of the decore shaft."

Second, DET argues for inclusion of the function (contacting a core for removal) in the claim construction, which DPF argues is improper based on Federal Circuit precedent that the construction should describe what the claim *is*, not just what it *does*. *See Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 920–21 (Fed. Cir. 2021) (citation omitted). But this guidance from the Federal Circuit applies to "non-functional claim terms in apparatus claims," not necessarily to functional claim terms. *See id.* at 921 (citation omitted). "A patent applicant is free to recite features of an apparatus either structurally or functionally." *In re Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) (citation omitted). Here, the specific plate is limited by a functional description—"decore engagement." The specification describes the decore engagement plate as "push[ing] the existing

core out of the DECD housing." '920 Patent at 9:1–2. Thus, inclusion of this functional limitation to differentiate the decore engagement plate from any other sort of "plate" is proper.

Finally, based on the embodiment in Figure 3A, DPF contends that the decore engagement plate must be a "circular disk." *See* Doc. 158, DPF's Br., 21. DET argues that Figure 3A is merely one embodiment, not a limitation on the plain language of the claim. *See* Doc. 155, DET's Br., 17. The Court agrees with DET that the embodiment in Figure 3A does not limit the scope of the claim term, which could include a plate of any shape so long as it is configured to push out a core.

The Court adopts a combination of the proposed constructions for "decore engagement plate": "a portion of the decore shaft that is configured to contact a core for removal from a DECD housing."

    C.    *Claim 4*

        1.    Second Diameter is *Approximately Equal* to an Inside Diameter of the DECD Housing

| Claim Term | DET's Proposed Construction | DPF's Proposed Construction | Adopted Construction |
| --- | --- | --- | --- |
| The system of claim 1, wherein the second internal aperture comprises a second diameter, the **second diameter is *approximately equal* to an inside diameter of the DECD housing**. | No construction necessary; plain and ordinary meaning applies | § 112(b): "approximately" is indefinite<br><br>second diameter is equal to an inside diameter of the DECD housing | Plain and ordinary meaning applies |

The context of this disputed term is that the hole underneath the DECD housing from which the core is pushed out needs to align with the hole in the pushout donut so that the old core can fall through both holes into the collection container. The dispute is over (1) whether

"approximately" with reference to the respective sizes of the holes is indefinite and (2) whether the claim should be construed as requiring the two holes to be "equal" because they need to "align."

First, DPF argues that the term "approximately" is indefinite and that it provides no objective boundaries to inform a person of ordinary skill in the art what degree of deviation is permissible. *See* Doc. 158, DPF's Br., 22–23. DET responds that a person of ordinary skill in the art would understand "approximately" based on the specifications sufficient to make and use the invention. *See* Doc. 162, DET's Reply, 8–9.

Section 112(b) "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable." *Id.*

To support its argument, DPF principally relies on *Interval Licensing LLC v. AOL, Inc.*, which involved a patented "attention manager" that displays background content on a computer screen. *See* 766 F.3d 1364, 1366–67 (Fed. Cir. 2014). The display of content, according to the claim language, was required to be "in an unobtrusive manner that does not distract a user of the display device" from his or her primary interaction with the computer. *See id.* at 1368. The Federal Circuit found that the "'unobtrusive manner' phrase is highly subjective and, on its face, provides little guidance to one of skill in the art." *Id.* at 1371. The phrase was subjective because it depended on a user-to-user tolerance of what manners of display would be considered "distracting" and, as a result, did not provide sufficient notice of the patent's scope. *See id.*

Despite holding that "unobtrusive" was subjective in the context of human capacity to avoid distraction, the Federal Circuit did not hold that "terms of degree are inherently indefinite." *Id.* at

-18-

1370. As long as the claims—taken with the specifications and prosecution history—provide "objective boundaries for those of skill in the art," they are definite. *See id.* at 1371 (citing *Nautilus*, 572 U.S. at 911 & n.8) (other citation omitted). To provide objective boundaries, the claim need not recite "precise numerical measurement" but must ensure that someone skilled in the art has "no difficulty" in determining the scope of the limitation sufficient to practice the invention. *Id.* at 1370 (first quoting *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1335 (Fed. Cir. 2010), then quoting *Eibel Process Co. v. Minn. & Ont. Paper Co.*, 261 U.S. 45, 65–66 (1923)).

Here, the use of "approximately" does not depend on user-to-user subjective tolerance in the way that the term "unobtrusive" does for background content on a computer. Instead, "approximately" conveys to someone attempting to build the invention that it would properly work—*i.e.*, allow the core to fall through both holes—even if the two holes are not exactly the same size, as long as they can generally be aligned to give the old core a vertical drop pathway. The term does not depend on user tolerance but is limited by proper functioning of the system. To a reasonable person of skill in the art, no more precision is required.

Second, DPF cites a specification stating that the two holes are "aligned," *see* '920 Patent at 8:45–47, to argue that "alignment" necessarily means the two holes are "equal" in size. *See* Doc. 158, DPF's Br., 22. However, "aligned"—in contrast with something like "exactly aligned" or a specification describing the relative sizes as "identical" or "equivalent"—does not clearly disavow the term "approximately" from the claim language. The specifications also do not reveal any purpose for exact alignment or exact equality in size. As DET explained at the hearing, approximate alignment allows for some "wiggle room" so that the old core, which might carry with it some excess debris, can smoothly pass through the pushout donut. DPF has not presented sufficient evidence to

essentially remove the word "approximately" from the claim language and impose a limitation of exact equality in size.

The Court therefore agrees with DET that the plain and ordinary meaning of "approximately equal" applies in Claim 4.

## IV.

## CONCLUSION

The Court **ORDERS** that the disputed terms be given the constructions discussed above.

**SO ORDERED**.

**SIGNED: November 5, 2025**.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE